UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:18-cr-333-RLY-KMB |
| | ) | |
| BRIAN FENNER, | ) | -01 |
| | ) | |
| Defendant. | ) | |

## **GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through counsel, Zachary A. Myers, United States Attorney for the Southern District of Indiana, and Kathryn E. Olivier, Assistant United States Attorney, hereby submits its Sentencing Memorandum in support of a within-Guidelines sentence of 108 months of imprisonment.

### **Factual and Procedural Background**

On January 23, 2020, a grand jury returned a superseding indictment charging defendants, Brian Fenner, Dennis Birkley, and AMI Asset Management, Inc., with Conspiracy to Commit Mail and Wire Fraud (1 count), Wire Fraud (7 counts), Mail Fraud (6 counts), and Money Laundering (3 counts).[1] (Docket No. 62.) The charges against the defendants were based on their years-long scheme to strip the liens off vehicles owned by individuals who were planning to file for bankruptcy, obtain clean title to those vehicles, resell the vehicles, and then split the profits.

The defendants obtained the vehicles that they subsequently ran through the lien-strip scheme by marketing to bankruptcy attorneys what Fenner called the "Free Chapter 7

---

[1] The charges against defendant AMI Asset Management, Inc. were dismissed on January 26, 2022.

Bankruptcy Program" or the "Sperro Program." Through the Program, Fenner offered to "pick up" vehicles from financially distressed individuals, ostensibly to return the vehicles to the lender. Instead, the vehicles were towed to Fenner's lot in Indianapolis without the knowledge or consent of the lenders. Fenner used this towing (which was funded by Birkley) and other bogus fees – which he formulated with Birkley – to form the basis of a grossly inflated mechanic's lien on the vehicles. The inflated liens dissuaded lenders from attempting to recover their vehicles and guaranteed Fenner and Birkley a profit even if the lenders were able to recover the vehicles. Fenner also frustrated the lenders' attempts to recover their vehicles by dodging their calls and by setting the mechanic's lien auctions for unreasonable times including 1:30 a.m. on Christmas Eve, 1:30 a.m. on Christmas Day, and 1:30 a.m. on New Year's Eve, so that he could "sell" the vehicles to Birkley at sham auctions. In reality, there were no auctions, no sales by Fenner to Birkley, and no purchases by Birkley.

To obtain clean and marketable title to the vehicles, Fenner and Birkley concealed their relationship to the world and lied to the Indiana Bureau of Motor Vehicles about material facts including: (1) the holder of the mechanic's lien (claiming the holder of the lien was Fenner when Birkley actually paid for the towing); (2) the amount of the mechanic's lien (grossly inflated); (3) the existence of an auction (there was none); and (4) the price paid by Birkley (Birkley admitted that he never paid Fenner for the vehicles). Armed with this clean title, the scheme kicked into gear – Birkley sold the vehicles for their true value and he and Fenner split the profits. All told, the years-long conspiracy resulted in the defendants earning more than $1 million.

To induce the bankruptcy attorneys to participate in the Program, the defendants paid the bankruptcy attorneys between $1,000 and $1,500 for each vehicle that was towed to Fenner's lot.

These payments were made by Birkley or his company, AMI, with the proceeds of the conspiracy, but they were made in Fenner's name (and often using Fenner's checkbook) to conceal Birkley's and AMI's involvement with the Program.

Following a five-day trial in January 2023, a jury found the defendants guilty of all counts. Defendant Fenner is scheduled to be sentenced by the Court on June 8, 2023.

## ARGUMENT

A within-Guidelines sentence of 108 months of imprisonment is reasonable and appropriate under 18 U.S.C. § 3553(a). In arriving at the Guidelines range of 87-108 months of imprisonment (Docket No. 242 ¶ 102), the PSR calculated the loss amount as more than $1 million but less than $1.5 million and included enhancements for the number of victims (U.S.S.G. § 2B1.1(b)(2)(A)), the use of sophisticated means (U.S.S.G. § 2B1.1(b)(10)(C)), and obstruction of justice (U.S.S.G. § 3C1.1). Fenner has objected only to the imposition of the two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1. As set forth below, his objection to the enhancement should be overruled.

1. **The Court should impose the two-level enhancement for obstruction of justice.**

Section 3C1.1 of the Sentencing Guidelines provides for a two-level enhancement:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impeded, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense . . . .

A "simple denial of culpability cannot serve as the basis of an obstruction of justice enhancement pursuant to § 3C1.1." *United States v. White*, 240 F.3d 656, 662 (7th Cir. 2001). If, however, a defendant "'decide[s] to take the stand and tell the jury a story,' he does so at his own risk, for if

3

he commits perjury, the court may, at the time of sentencing, enhance his sentence for obstructing justice." *United States v. Hickok*, 77 F.3d 992, 1007 (7th Cir. 1996) (quoting *United States v. Contreras*, 937 F.2d 1191, 1194 (7th Cir. 1991)). Thus, when a defendant falsely testifies regarding a material matter with the intent to provide such false testimony – rather than as a result of confusion, mistake, or faulty memory – the court may apply the obstruction enhancement. *See, e.g.*, *United States v. Stenson*, 741 F.3d 827, 831 (7th Cir. 2014); *United States v. Williams*, 272 F.3d 845, 864 (7th Cir. 2001).

In applying the obstruction enhancement based on perjury, "'the district court should indicate that it has found all of the elements of perjury: falsity, willfulness and materiality.'" *United States v. Turner*, 203 F.3d 1010, 1020 (7th Cir. 2000) (quoting *United States v. Brimley*, 148 F.3d 819, 823 (7th Cir. 1998)). In such cases, "a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same . . . ." *United States v. Dunnigan*, 507 U.S. 87, 95 (1993). To that end, the Court "must also find that a defendant testified untruthfully with the specific intent to obstruct justice rather than as a result of confusion, mistake, or faulty memory." *United States v. Gage*, 183 F.3d 711, 715 (7th Cir. 1999) (citing *Dunnigan*, 507 U.S. at 94); *see also United States v. Ewing*, 129 F.3d 430, 434 (7th Cir. 1997) ("Section 3C1.1 requires specific intent to obstruct justice."). As to materiality, the enhancement is proper where a defendant knowingly makes a false declaration that "'could affect, to some reasonable probability, the outcome of the judicial process.'" *United States v. DeLeon*, 603 F.3d 397, 404 (7th Cir. 2010) (quoting *United States v. Mayberry*, 272 F.3d 945, 949 (7th Cir. 2001)). The Government bears the burden of proving by a preponderance of the evidence that the enhancement is warranted. *Ewing*, 129 F.3d at 434 (citing *United States v. Hamm*, 13 F.3d 1126, 1129-30 (7th Cir. 1994)).

4

The Seventh Circuit regularly affirms the imposition of the obstruction enhancement where a defendant testifies falsely about a material matter – just as Fenner did here. *See, e.g.*, *United States v. Coleman*, 914 F.3d 508, 513 (7th Cir. 2019) (affirming imposition of obstruction enhancement based on court's findings that defendant's testimony was calculated to confuse the jury and was inconsistent with other testimony); *United States v. Betts-Gaston*, 860 F.3d 525, 540-41 (7th Cir. 2017) (affirming imposition of obstruction enhancement where defendant's testimony was implausible and was contradicted by a more credible witness); *United States v. Mbaye*, 827 F.3d 617, 621-22 (7th Cir. 2016) (affirming imposition of obstruction enhancement where district court found the defendant's testimony to be "nonsense" based on the absurdity of his explanation); *Stenson*, 741 F.3d at 830-31 (affirming imposition of obstruction enhancement where district court found the defendant's testimony incredible in light of the other evidence presented at trial – including other witnesses' testimony); *United States v. Ofcky*, 237 F.3d 904, 910 (7th Cir. 2001) (affirming imposition of obstruction enhancement where district court "met all the standards required for the [obstruction of justice] enhancement" when it weighed conflicting testimony and concluded that the defendant committed perjury); *United States v. Menting*, 166 F.3d 923, 929 (7th Cir. 1999) (affirming imposition of obstruction enhancement where district court concluded that the defendant had lied because the defendant's testimony was directly contradicted by three witnesses that the court found credible).

In this case, Fenner testified at trial that he and Birkley had a floor-plan financing agreement through which Fenner was extending Birkley credit and Birkley was paying Fenner back over time. (*See, e.g.*, Transcript at 715:22-716:8 (explaining the floor plan financing agreement), 720:18-25 (claiming that Birkley owed him money).) In other words, Fenner claimed that – contrary to all of the documentary evidence – he was Birkley's financier. As an

5

initial matter, this was the first time in the more than four years that this case was pending that Fenner made such a claim. (*See, e.g.*, Transcript at 723:25-724:6 (admitting that he never mentioned any floor plan financing agreement during his deposition).) Beyond that, however, the evidence admitted at trial – and the evidence that the jury evidently believed when it convicted both defendants – established that *Birkley* was financing the fraud scheme – not Fenner. (*See, e.g.*, Exhibit 118 (email with quarter 1 profit/loss summary from Birkley to Fenner in which Birkley says "I still need 22,453.73 for expenses and 9000 for pay advance . . ."); Exhibit 134 (email from Fenner to Birkley confirming that Birkley is owed "22,453.73 plus 9000.00 in advance . . ."); Exhibit 145 (email from Fenner to Birkley in which Fenner stated he needs "3500 this month" to pay personal expenses and Birkley responds "[a]ll the other months you took 3000 . . ."); Exhibit 207 (email from Birkley to Fenner with quarter 2 profit/loss summary).) There were no exhibits, and frankly no evidence, that showed any debt owed to Fenner. Notably, Birkley summary sheets on each individual vehicle lacked a line item for any payments to Fenner – be that for the purported purchase price at the auction or to pay down the floor plan financing agreement. This is not just inconsistent with Fenner's testimony, but directly opposite to it. Fenner also alleged that the reason he never provided a copy of the floor plan financing agreement was because the Government had seized all of his documents and records. (Transcript at 737:8-12.) This ignores the fact that the Government produced copies of all of the seized records in discovery. (Transcript at 737:13-14.) It also ignores the fact that if Fenner truly believed such an agreement existed and had not been produced by the Government in discovery, he could have made a specific request for the document. (*Id.*)

Following Fenner's unsupported, uncorroborated, and entirely novel testimony, the Government re-called Special Agent Kathryn Graham to testify during its rebuttal case. Special

6

Agent Graham testified that no floor plan financing agreement was found. (Transcript at 762:7-19.) Special Agent Graham's testimony was credible and unimpeached. (*See* Transcript at 762:21-25.)

The Government is not asserting that the obstruction enhancement applies simply because Fenner exercised his constitutional right to testify and then provided testimony that contradicted the Government's case. Rather, the Government is seeking the two-level enhancement because the Defendant lied about a document – and an agreement – that did not exist. (*See, e.g.*, Transcript at 737:8-12 (alleging that the floor plan financing agreement existed but had been seized by the Government).) This is not a statement that resulted from confusion, mistake, or a faulty memory. Nor was it a simple denial of guilt. It was a calculated lie created to obstruct justice. *See* U.S.S.G. § 3C1.1 (Application Notes 4(B) & 4(F).) It was also material because, if believed, the testimony would "tend to influence or affect the issue under determination." *Id.* (Application Note 6).

Fenner's testimony about the floor plan financing agreement was directly contradicted by the evidence that showed that: (1) Birkley was the money man; and (2) Fenner and Birkley were splitting their profits without any accounting for a "financing agreement." (*See, e.g.*, Exhibit 107 (email exchange between Fenner and Birkley in which, following Birkley's accounting of the profit on three cars, Fenner says "[a]ll I need is 3K take the rest"); Exhibit 118 (email with quarter 1 profit/loss summary from Birkley to Fenner in which Birkley says "I still need 22,453.73 for expenses and 9000 for pay advance . . ."); Exhibit 134 (email from Fenner to Birkley confirming that Birkley is owed "22,453.73 plus 9000.00 in advance . . ."); Exhibit 145 (email from Fenner to Birkley in which Fenner states he needs "3500 this month" to pay personal expenses and Birkley responds "[a]ll the other months you took 3000 . . ."); Exhibit 207 (email

7

from Birkley to Fenner with quarter 2 profit/loss summary).) The inconsistency between Fenner's testimony and the defendants' business records cannot be construed as the result of mistake, confusion, or faulty memory on Fenner's part. The agreement either existed or it did not. There is no middle ground, and based on the jury's verdict, the jury believed the business records and the testimony of Special Agent Graham, not Fenner. The Court should reach the same conclusion.

Beyond that, Fenner's testimony was absurd on its face. Fenner would have the Court believe that he never mentioned the floor plan financing agreement, which would have vindicated him, until the last day of his criminal trial simply because he did not have a copy of the agreement. This is ridiculous. First, the Government provided substantial discovery (including copies of all of the seized records and emails) to both defendants. Beyond that, however, if such an agreement existed, one would assume that Fenner would have mentioned that in the over four years that this case was under investigation. (*See, e.g.*, Transcript at 724:24-725:3 (concession by Fenner that he never mentioned the floor plan financing agreement during his deposition).) Such an implausible theory is immediately suspect. *See, e.g.*, *Betts-Gaston*, 860 F.3d at 541 (documenting the absurd facts one would have to accept in order to believe defendant's testimony); *United States v. Hagerman*, 525 F. Supp. 2d 1058, 1063-64 (S.D. Ind. 2007), *aff'd* 555 F.3d 553 (7th Cir. 2008) (upholding imposition of obstruction enhancement and characterizing defendant's testimony as "simply preposterous" and an "absurd story").

The only credible conclusion supported by the record is that Fenner lied on the stand about the floor plan financing agreement. This lie – during the prosecution of the case against him – related directly to the offenses of conviction. Fenner's testimony was an attempt to convince the jury that he was innocent. The jury did not believe Fenner, nor should the Court.

8

Fenner's testimony was not an "alternative theory" nor was it "putting the government to its burden." It is a bald-faced lie told in an attempt to generate reasonable doubt. As a result, the two-level obstruction enhancement is appropriate.

**2.     The § 3553(a) factors indicate that a sentence of 108 months of imprisonment is appropriate.**

A sentence of 108 months of imprisonment accounts for the nature and circumstances of Fenner's offenses, as well as his specific history and characteristics. It will also serve the goals of 18 U.S.C. § 3553(a) by reflecting the seriousness of the offenses, providing just punishment, promoting respect for the law, and affording adequate deterrence.

A sentence of 108 months of imprisonment recognizes that Fenner perpetrated his fraud scheme over a period of years – from at least August 2013 until March 2016 – by lying to bankruptcy debtors, their attorneys, lenders, and the Indiana Bureau of Motor Vehicles. As a result of Fenner's conduct, approximately 59 lenders lost vehicles that they had financed, and Fenner and Birkley made more than $1 million in profit.

Fenner's conduct was not the result of a mistake. For years, he perpetrated his fraud and attempted to conceal his criminal activities. He lied to the bankruptcy attorneys to whom he marketed his Program. He lied to the financially distressed individuals from whom he obtained the vehicles that he ran through the lien-strip scheme. He lied to the lenders and to the Indiana BMV about the fees that gave rise to his mechanic's liens. He lied about the fact that he was the holder of mechanic's liens on the vehicles. He lied about the existence of mechanic's lien auctions. He lied about his sales to Birkley. When the lenders started to become suspicious, he lied under oath during a deposition about the nature of his relationship with Birkley. He did all of this to keep the scheme going because the scheme only worked if Fenner and Birkley

9

appeared to have an arm's length relationship.  There was no mistake here.  Only lies, manipulation, and greed.

A Guidelines sentence will also send a message to other would-be fraudsters in the Southern District of Indiana and elsewhere that courts take white collar crime seriously.  Indeed, such a sentence will send a message that these crimes are treated just as seriously as crimes of violence or controlled substance offenses.  By imposing a sentence within the Guidelines, the Court will send a message that the law must be respected.

Fenner's behavior at trial – which resulted in him being admonished by the Court – and culminated in his false testimony, further demonstrates a lack of respect for the law.  To be sure, Fenner has a constitutional right to testify; however, as explained above, his testimony was not credible and was contradicted by documentary evidence and by other witness testimony.  Moreover, there are hints of Fenner's willingness to say whatever he thinks will help him – without any regard for whether it is true – in the PSR.  (*See, e.g.*, Docket No. 242 ¶ 69 (statements from Debra Fenner regarding the defendant's repeated lies).)  Again, this belies his complete and total lack of respect for the law.  The PSR also reveals Fenner's repeated failures to provide various documentation to the Probation Officer despite multiple requests.  (*See, e.g.*, Docket No. 242 ¶¶ 75 (noting the defendant's refusal to provide "supporting medical documents for his current diagnoses and treatments"), 83 (noting the defendant's refusal to provide "details of his employment history"), 94 (noting the defendant's refusal to "submit specific financial information and supporting documentation" including information regarding his current income).)  This is further evidence of his lack of respect for the law.

A within-Guidelines sentence would also deter other would-be fraudsters from engaging in criminal conduct.  General deterrence is a critical component of sentencing in white collar

cases like this one. White collar criminals engage in a cost-benefit analysis – weighing the risks associated with getting caught against the potential financial gain from the offense – when deciding whether to commit their offenses. For this reason, imprisonment is particularly deterrent in white collar cases. *See United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013); *see also United States v. Warner*, 792 F.3d 847, 860-61 (7th Cir. 2015) (citing the court's reasoning in *Peppel* favorably). Moreover, the Guidelines were created, in part, to help address the concern that white collar offenders "frequently do not receive sentences that reflect the seriousness of their offenses." S. Rep. No. 98-224 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3260. A sentence outside the Guidelines range would create disparities with other types of offenders that would reinforce the perception that white collar offenders receive special treatment and would thus undermine deterrence as well as respect for the law. *United States v. D'Amico*, 496 F.3d 95, 107 (1st Cir. 2007) (explaining that lower sentences for white collar criminals contradict the purpose of the Guidelines), *rev'd on other grounds by D'Amico v. United States*, 522 U.S. 1173 (2008).

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court sentence the Defendant to a within-Guidelines term of imprisonment of 108 months.

    Respectfully submitted,

    ZACHARY A. MYERS
    United States Attorney

By:   /s/ Kathryn E. Olivier
    Kathryn E. Olivier
    Assistant United States Attorney